Mark Punzalan (SBN: 247599)
markp@punzalanlaw.com
PUNZALAN LAW, P.C.
600 Allerton Street, Suite 201
Redwood City, California 94063
Tel: 650.362.4150
Fax: 650.362.4151

Na'il Benjamin (SBN: 240354)
nbenjamin@BenjaminLawGroup.com
BENJAMIN LAW GROUP, A.P.C.
101 California St., Ste. 2710
San Francisco, California 94111
Tel: 415.633.8833
Fax: 415.349-3334

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA RUGGIERO, on Behalf of Herself and All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| IDENTIV. INC.: JASON HART: BRIAN NELSON: JAMES OUSLEY: STEVEN HUMPHREYS: STEVEN FINNEY; GARY KREMEN; DANIEL WENZEL. | **JURY TRIAL REQUESTED** |
| Defendants. | |

Plaintiff Ana Ruggiero ("Plaintiff"), by her attorneys, except for her own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Identiv, Inc. ("Identiv" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## I.     NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased Identiv common stock between November 7, 2013 and November 23, 2015, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's claims are asserted against Identiv and certain executive officers.

2.     Identiv is a global security technology company that provides trust solutions in the connected world, including premises, information and everyday items.

3.     Since November 7, 2013, the Company has repeatedly made material misrepresentations and omitted material information concerning, among other things, the Company's revenue recognition practices, key accounting metrics, and its internal controls.

4.     On November 30, 2015, the Company announced that its independent public accounting firm resigned and that the accounting firm was unwilling to be associated with the consolidated financial statements prepared by management for the 2015 fiscal periods.  Further, it was revealed that the accounting firm would not complete its reviews of the interim financial information as of or for the periods ended March 31, 2015, June 30, 2015 or September 30, 2015, and also would not audit the Company's consolidated financial statements as of and for the year ending December 31, 2015 because of a disagreement between the Company's Audit Committee and the accounting firm.

5.      On this news, the price of Identiv common stock sank.  Its share price fell $0.46, or 15.59%, from a closing share price of $2.95 on November 30, 2015 to $2.49 per share on December 1, 2015 on *extremely* heavy trading volume.

## II.    JURISDICTION AND VENUE

6.      The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

8.      This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.  Identiv is headquartered in this District, with its principal place of business located at 2201 Walnut Avenue, Suite 310, Fremont, California 94538.

## III.   PARTIES

10.     Plaintiff acquired Identiv securities as set forth herein and in its certification filed herewith.

11.     Identiv is a corporation organized and existing under the laws of the State of Delaware.  It maintains its principal corporate offices at 2201 Walnut Avenue, Suite 310, Fremont, California 94538.  Its common stock trades on NASDAQ under the symbol, "INVE."

12.     Defendant Hart is the President of the Company, and he also serves on the Board of Directors.

13.     Defendant Nelson was the Company Chief Financial Officer between December 2013 to November 2015.

14.     Defendant Ousley is the Charman of the Board of the Company, and he has served as a director since July 2014.  He also currently serves as chairman of the Audit Committee.

15.     Defendant Humphreys is the Chief Executive Officer of the Company, and he also serves as a Director.

16.     Defendant Finney is the Interim Chief Financial Officer of the Company.

17.     Defendant Kremen is a Director of Identiv.

18.     Defendant Wenzel is a Director of Identiv.

19.     Defendants Hart, Nelson, Ousley, Humphreys, Finney, Kremen, and Wenzel are collectively referred to herein as the "Individual Defendants."

20.     Identiv and the Individual Defendants are collectively referred to herein as "Defendants."

21.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, possessed the power and authority to control the contents of Identiv's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

IV.     **SUBSTANTIVE ALLEGATIONS**

A.      **Background**

22.     Identiv is a global security technology company that provides trust solutions in the connected world, including premises, information and everyday items. The Company has four operational business segments: Premises, Identity, Credentials and All Other. The Company's

uTrust premises products offerings include MX controllers, Velocity management software and Touch Secure (TS) door readers. Its Identity products include uTrust readers, which is a range of contact, contactless, portable and mobile smart card readers, tokens and terminals. Its credentials products are NFC and radio frequency identification (RFID) products, including inlays and inlay-based cards-labels, tags and stickers, as well as other radio frequency (RF) and integrated circuit (IC) components. The Company's All Other segment includes products, such as Chipdrive and Media readers.

B.    **The Material Misrepresentations and Omissions**

23.    On November 7, 2013, the beginning of the Class Period, the Company issued a press release announcing its results for the third quarter of 2013.   The press release stated in relevant part:

**Financial Results for Q3 2013 Compared with Q3 2012**

·Total revenues were $26.3 million, up 14% from $22.9 million.

·Revenues from the Identity Management Services & Solutions segment were $12.3 million, down 11% from $13.8 million. Sales of access control and security solutions decreased 12% year over year as a result of the U.S. Government federal budget sequester, but reflected significant improvement from the prior quarter as federal agencies adapted to lower budget levels and prioritized spending on security programs.

·Revenues from the ID Products segment grew 53% to $13.9 million, compared with $9.1 million. This growth was driven by a 131% increase in sales of RFID and NFC products for consumer electronics toys.

·GAAP gross profit margin improved to 43%, compared with 42%, primarily due to improving margins in RFID and NFC products arising from higher sales volumes and increased capacity utilization.

·Base operating expenses, which include research and development, sales and marketing, and general and administrative costs, were unchanged at $12.1 million.

·Impairment charges to goodwill and long-lived assets were $22.9 million, compared with $5.9 million. In addition, restructuring costs of $1.3 million were recorded in Q3 2013.

·Including impairment charges and restructuring costs, GAAP net loss was $(24.2) million, or $(0.35) per share, compared with GAAP net loss of $(7.9) million, or $(0.13) per share.

·Excluding impairment charges and restructuring costs, non-GAAP net loss was $(1.0) million, or $(0.01) per share, compared with non-GAAP net loss of $(1.6) million, or $(0.03) per share.

·Adjusted EBITDA was $0.6 million, compared with $(0.2) million.

·Backlog at the end of Q3 was $20.0 million, reflecting orders over the next 12 months for NFC and reader products as well as payment and cloud-based systems; also on the order book is an additional $7.0 million from longer-term contracts. Of the total amounts, $7.0 million in current backlog and $3.0 million in longer-term contracts relates to businesses under review for possible divestiture.

A common stock offering under a private placement was completed in August 2013, with gross proceeds of $7.1 million to be used to fund operations.

Cash and cash equivalents were $9.5 million at September 30, 2013, compared with $3.7 million at June 30, 2013. Cash at the end of Q3 included gross proceeds of $7.1 million from the company's private placement and $2.0 million of football match day concession receipts which were remitted to caterers at the beginning of October.

Commenting on the financial results for Q3 2013, David Wear, chief financial officer of Identiv stated, "With the review of our non-performing business areas for potential divestiture and sustained decline in our stock price, we performed an impairment analysis of our goodwill and long-lived assets. Based on this analysis, we concluded that some assets are impaired and recognized preliminary non-cash charges totaling $22.9 million in the quarter, which accounted for $(0.34) per share of the net loss per share recorded in Q3. These charges have no impact on our day-today operations or liquidity and will not result in any future cash expenditures. Looking ahead, our current restructuring activities are expected to result in further charges in the fourth quarter and to result in lower operating expenses in
future periods."


**Outlook for Q4 2013**

Based on its current expectations and the continued uncertainty associated with the U.S. Government business, management expects revenues of $25.0 million to $27.0 million for the fourth quarter of 2013, and further expects adjusted EBITDA of $(0.0) million to $1.0 million. In addition, and as referenced above, management is in the process of discontinuing underperforming assets which is expected to lead to divestment of certain businesses in the current quarter. Current guidance includes the expected results of these businesses of revenue of $5.0 million to $6.0 million and adjusted EBITDA loss of $(0.5) million to $0.0 million. The timing of such divestment is uncertain.

24.     On November 13, 2015, Identiv filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal third quarter.  The Company's Form 10-Q was signed by Defendant Hart, and reaffirmed the Company's statements in the November 7, 2013 press release.  The Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by Defendant Hart, who both certified the following:

> …pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that (1) the Quarterly Report of Identive Group, Inc. on Form 10-Q for the quarterly period ended September 30, 2013 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (2) the information contained in such Quarterly Report on Form 10-Q fairly presents in all material respects the financial condition and results of operations of Identive Group, Inc.

25.     On March 20, 2014, the Company issued a press release announcing its results for fourth quarter of 2013.  The press release stated in relevant part:

> "We have made excellent progress in Q4 to simplify and focus the business as we lay the foundation for growth in 2014," said Jason Hart, chief executive officer of Identiv. "We have transformed from a group of separate businesses to a single, unified company focused on delivering high-growth trust solutions for the Internet of Things. The divestment of underperforming and non-core activities in addition to consolidating the remaining operations has eliminated over $12 million of debt from our balance sheet and reduced headcount by nearly 25 percent."
>
> **Quarterly Review (Q4 2013 compared with Q4 2012)**
>
> Note: financial results contained in this release reflect the continuing operations of Identiv only and exclude discontinued operations of non-core businesses sold in December 2013 and January 2014.
>
> - Total revenues for continuing operations were in line with guidance at $19.9 million, compared to $21 million. The quarter over quarter change is primarily a result of the October 2013 U.S. government shutdown.
> - Trust solutions for information grew, with sales of cloud-based credential provisioning and management services increasing 21 percent and smart card reader shipments increasing 11 percent. Sales of trust solutions for everyday items (RFID and NFC products) increased 13 percent to meet demand for electronic game toys and other Internet of Things applications.
> - GAAP gross profit margin improved to 44 percent, compared to 42 percent, primarily due to improving margins for RFID and NFC products arising from higher sales volumes and increased capacity utilization.
> - Identiv signed two new substantial sales partners: *a global telecommunications*

and business solutions provider, and one of the largest global security distributors. As an early indication of success with these partners, initial product orders to support a government e-health program were received in Q4, with the bulk of delivery in 2014 and 2015.

• Base operating expenses, which include research and development, sales and marketing, and general and administrative costs, were $9.2 million, compared with $8.6 million. During Q4 the Company hired additional sales and marketing personnel and began to build a global organization to oversee product management and deliver new marketing and lead generation programs.

• Identiv achieved its second consecutive quarter of positive adjusted EBITDA, which was $0.4 million, compared with $0.9 million. Including impairment charges and restructuring costs totaling $5.2 million, GAAP loss from continuing operations was $(5.7) million, or $(0.09) per share, compared with GAAP gain from continuing operations of $1.2 million, or $0.01 per share in the comparable prior year period.

• Cash and cash equivalents were $5.1 million at December 31, 2013, compared with $7.5 million at September 30, 2013, which excludes $2.0 million of temporary concession receipts from a divested business that were remitted to caterers at the beginning of October.

**Fiscal Year 2013 Highlights**

• Total revenue was $75.6 million in 2013, up 4 percent from $72.4 million in 2012. Sales of trust solutions for everyday items grew more than 50 percent, driven by strong demand as Identiv delivered more than 100 million RFID tags for electronic game toys. Sales of trust solutions for information grew as shipments of smart card reader products increased 10 percent, and sales of cloud-based credential services climbed 68 percent with the receipt of first significant long-term contracts. The U.S. budget sequester and government shutdown contributed to a 29 percent decrease in sales of trust solutions for premises.

• Adjusted EBITDA in 2013 was $(1.1) million, compared with $(2.9) million in 2012.

• Identiv signed an OEM relationship with one of North America's largest security system integrators.

Hart added, "Q4 was the first full quarter for the new management team as we focused on simplifying the business and addressing the cost structure. The significant shift in costs from G&A to sales, marketing and engineering represent an investment in growth. We will shortly launch our new corporate vision which embraces the strengths of our people and technology as we align to the high growth trust solutions for the rapidly expanding connected world."

26.     On March 31, 2014, Identiv filed its Annual Report with the SEC on Form 10-K for the 2013 fiscal year. The Company's Form 10-K was signed by Defendants Hart and Nelson, and

reaffirmed the Company's statements in the March 20, 2014 press release.   The Form 10-K contained SOX Certifications signed by Defendants Hart and Nelson and was substantially similar to the certification described in ¶20, *supra*.

27.   On May 15, 2014, the Company issued a press release announcing its results for the first quarter of 2014.   The press release stated in relevant part:

> "In Q1 2014, we continued cost reductions and focused on growth, seeing early success with increased revenue of 8 percent, compared to Q1 2013," said Jason Hart, chief executive officer of Identiv. "Our credentials products, used in our trust solutions for everyday items, grew 36 percent compared to Q1 2013, with strong demand from electronic gaming and other Internet of Things applications."
>
> "We significantly enhanced liquidity with a $20 million term loan and line-of-credit agreement on favorable commercial terms with Opus Bank, allowing retirement of previous expensive debt, increased liquidity and reduced debt service in future quarters," Hart added.
>
> **Q1 Financial Summary**
>
> In reviewing the results for the first quarter of fiscal year 2014, compared to the first quarter of fiscal year 2013:
>
> - Total revenues for continuing operations were $17.2 million, compared to $16.0 million, reflecting growth of 8% with significant contribution from sales of credentials products increasing 36% to meet demand for electronic game toys and other Internet of Things applications.
>
> - GAAP gross profit margin was 39%, compared to 42%, primarily due to product mix.
>
> - Base operating expenses, which include research and development, sales and marketing, and general and administrative costs, were $9.6 million, compared to $10.3 million. At the same time, the company was able to increase investment in sales and marketing by 7%, offset by a reduction in general and administrative expenses of 21%.
>
> - Adjusted EBITDA for the quarter was $(2.0) million, compared to $(2.1) million.
>
> - GAAP net loss from continuing operations was $(5.6) million in Q1 2014, which included restructuring costs totaling $0.4 million, or $(0.07) per share, compared with GAAP loss from continuing operations of $(4.0) million, or $(0.07) per share in the comparable prior year period. There were no restructuring costs in Q1 2013.
>
> - Cash and cash equivalents were $12.0 million at March 31, 2014, compared with $5.1 million at December 31, 2013.

- In March 2014, Identiv entered into term loan and line-of-credit agreement with Opus Bank, of which $6.0 million was used to refinance the debt with Hercules.

Note: Financial results contained in this release reflect the continuing operations of Identiv only and exclude discontinued operations of non-core businesses sold in December 2013 and February 2014.

"Our investment in growth is producing results as reflected by our Q1 2014 total revenues. In addition, we continue executing on additional opportunities to streamline the business and improve margins, including consolidation of our factories, which, when complete, will yield a margin improvement in our rapidly growing trust solutions for everyday items," Hart added.

28.     On August 13, 2014, the Company issued a press release announcing its results for the second quarter of 2014.  The press release stated in relevant part:

"In Q1 2014, we continued cost reductions and focused on growth, seeing early success with increased revenue of 8 percent, compared to Q1 2013," said Jason Hart, chief executive officer of Identiv. "Our credentials products, used in our trust solutions for everyday items, grew 36 percent compared to Q1 2013, with strong demand from electronic gaming and other Internet of Things applications."

"We significantly enhanced liquidity with a $20 million term loan and line-of-credit agreement on favorable commercial terms with Opus Bank, allowing retirement of previous expensive debt, increased liquidity and reduced debt service in future quarters," Hart added.

**Q1 Financial Summary**

In reviewing the results for the first quarter of fiscal year 2014, compared to the first quarter of fiscal year 2013:

- Total revenues for continuing operations were $17.2 million, compared to $16.0 million, reflecting growth of 8% with significant contribution from sales of credentials products increasing 36% to meet demand for electronic game toys and other Internet of Things applications.

- GAAP gross profit margin was 39%, compared to 42%, primarily due to product mix.

- Base operating expenses, which include research and development, sales and marketing, and general and administrative costs, were $9.6 million, compared to $10.3 million. At the same time, the company was able to increase investment in sales and marketing by 7%, offset by a reduction in general and administrative expenses of 21%.

• Adjusted EBITDA for the quarter was $(2.0) million, compared to $(2.1) million.

• GAAP net loss from continuing operations was $(5.6) million in Q1 2014, which included restructuring costs totaling $0.4 million, or $(0.07) per share, compared with GAAP loss from continuing operations of $(4.0) million, or $(0.07) per share in the comparable prior year period. There were no restructuring costs in Q1 2013.

• Cash and cash equivalents were $12.0 million at March 31, 2014, compared with $5.1 million at December 31, 2013.

• In March 2014, Identiv entered into term loan and line-of-credit agreement with Opus Bank, of which $6.0 million was used to refinance the debt with Hercules.

Note: Financial results contained in this release reflect the continuing operations of Identiv only and exclude discontinued operations of non-core businesses sold in December 2013 and February 2014.

"Our investment in growth is producing results as reflected by our Q1 2014 total revenues. In addition, we continue executing on additional opportunities to streamline the business and improve margins, including consolidation of our factories, which, when complete, will yield a margin improvement in our rapidly growing trust solutions for everyday items," Hart added.

29.     On November 13, 2014, the Company issued a press release announcing its results for the third quarter of 2014.  The press release stated in relevant part:

"In Q3 2014, we saw continued growth in revenue and achieved positive adjusted EBITDA," said Jason Hart, Identiv CEO. "The steps taken to streamline our business have allowed us to build a stable platform to deliver our products and services and to continue investing in sales, marketing, and product development."

**Q3 Financial Summary**

In reviewing the results for the third quarter of fiscal year 2014, compared to the third quarter of fiscal year 2013:

• Total revenues for continuing operations were $22.7 million, compared to $20.9 million, reflecting growth of 9%, with significant contribution from sales of credentials products increasing 49% to meet demand for electronic game toys, offset by lower sales of Premises and Identity products.

• GAAP gross profit margin was 43%, compared to 48%, primarily due to product mix.

• Base operating expenses, which include research and development, sales and

marketing, and general and administrative costs, were $10.6 million, compared to $10.0 million, up 6%. The company increased its investment in sales and marketing by 12% and in research and development by 10%, offset by a reduction in general and administrative expenses of 4%.

- Adjusted EBITDA for the quarter was $0.99 million, compared to $0.95 million.

- GAAP net loss from continuing operations was $(3.9) million in Q3 2014, which included restructuring costs totaling $1.8 million, or $(0.46) per share, compared with GAAP net loss from continuing operations of $(12.9) million, or $(1.69) per share, in the comparable prior year period. There were restructuring costs of $1.3 million and impairment charges to goodwill and long lived assets of $11.1 million in Q3 2013.

- Cash was $41.1 million at September 30, 2014, compared with $5.1 million at December 31, 2013, reflecting proceeds from a refinancing of debt in March 2014 and an underwritten offering of common stock in September 2014.

Note: Financial results contained in this release reflect the continuing operations of Identiv only and exclude discontinued operations of non-core businesses sold in December 2013, February 2014 and June 2014.

"In Q3 2014, we continued to build a solid organization which is well capitalized, has unique technology, and a new sales organization to execute on our strategy. As the relationships formed this year with strategic technology, telecommunications, and distribution partners begin to mature, we believe we are well-aligned in the identity and security marketplaces," said Hart. "While a number of internal consolidation and cost-efficiency projects are ongoing, our primary focus has transitioned to leveraging our know-how to deliver new security products throughout the remainder of this year and into 2015, while outpacing the annual industry growth rate in 2015."

30.     On March 12, 2015, the Company issued a press release announcing its results for the fourth quarter of 2014 and fiscal year ended December 31, 2014.  The press release stated in relevant part:

"In 2014, we successfully completed two substantial tasks: creating a fiscally stable business delivering quality security products to our customers; and aligning Identiv to take the leadership position in providing privacy and security as the Internet of Things continues to expand exponentially," said Jason Hart, Identiv CEO. "During the fourth quarter and throughout the year, we invested extensively in new products, increased our penetration into new markets with new distribution, OEM and integrator partnerships and expanded our direct sales organization. This investment in 2014, along with our realignment of the business, has enabled us to focus on growth in 2015 and the years to come. We are at an incredible intersection of unprecedented connectivity and the new demand for privacy and security at all levels of our society, creating a marketplace for our

solutions and enabling us to create value for shareholders."

**Fourth Quarter Financial Highlights Review**

In reviewing the results for the fourth quarter of fiscal year 2014, all figures are compared to the fourth quarter of fiscal year 2013 unless stated otherwise:

- Total revenues were $19.4 million, a decrease of 1% from $19.5 million, primarily due to a decrease in Identity reader sales, partially offset by an increase in Premises sales to the U.S. Government customers.

- GAAP gross profit margin was 42%, compared to 44%, primarily due to a decrease in credentials margin.

- Base operating expenses, which include research and development, sales and marketing, and general and administrative costs were $9.8 million, compared to $9.2 million, up 7%. This is primarily a result of increased expenditures in research and development, partially offset by a $0.4 million non-recurring R&D tax credit in the fourth quarter of 2013.

- Adjusted EBITDA for the quarter was $0.16 million, compared to $0.37 million. Adjusted EBITDA in the prior year quarter benefited from the non-recurring R&D tax credit.

- GAAP net loss from continuing operations was $(6.2) million in the fourth quarter of 2014, or $(0.58) per share, compared with GAAP net loss of $(3.0) million, or $(0.88) per share. Fourth quarter 2014 results included restructuring costs of $0.2 million and earn-out consideration charge of $3.5 million, while there were restructuring costs of $0.5 million and impairment charges to goodwill and long lived assets of $4.6 million in the fourth quarter of 2013.

**Fiscal Year 2014 Financial Highlights**

In reviewing the results for fiscal year 2014, all figures are compared to fiscal year 2013 unless stated otherwise:

- Total revenue was $81.2 million in 2014, up 9% from $74.3 million. The results include a significant contribution from sales of Credentials products, primarily due to demand for electronic game toys. This was offset by lower sales of Identity readers.

- GAAP gross profit margin was 41%, compared to 45%, primarily due to product mix and lower margins experienced in the Credential segment.

- Base operating expenses, which include research and development, sales and marketing, and general and administrative costs, were $40.3 million, compared to $39.3 million, up 2%. The company increased its investment in sales and marketing by 9% and in research and development by 10%, partially offset by a

reduction in general and administrative expenses of 10%.

- Adjusted EBITDA in 2014 was $(1.3) million, compared with $(1.3) million.

- GAAP net loss from continuing operations was $(18.4) million in 2014 or $(2.12) per share, compared with GAAP net loss from continuing operations of $(25.0) million, or $(3.62) per share. Fiscal year 2014 results included restructuring costs of $3.1 million and earn-out consideration charge of $3.5 million, while there were restructuring costs of $1.8 million and impairment charges to goodwill and long lived assets of $15.6 million in the fourth quarter of 2013.

- Cash was $36.5 million at December 31, 2014, compared with $5.1 million at December 31, 2013, reflecting proceeds from a refinancing of debt in March 2014 (and amended in November) and an underwritten offering of common stock in September 2014.

31.     On August 13, 2015, the Company issued a press release announcing its results for the second quarter of 2015.  The press release stated in relevant part:

Second Quarter Financial Highlights Review

In reviewing the results for the second quarter of fiscal year 2015, all figures are compared to the second quarter of fiscal year 2014, unless stated otherwise:

- Total revenues were $15.6 million compared with $22.3 million in the second quarter of fiscal year 2014 and $14.9 million in the first quarter of 2015. The Company saw stable sales in its premises products but deferred more than $3.2 million in credential sales, which is expected to be recognized in the third quarter of 2015. The decline in the identity reader segment in international regions compared to 2014 continued.

- The Company has experienced an increase in large customer wins including a major international airline, multiple government agencies and large technology companies, but has seen delays in deployment of these projects resulting in delayed revenue for the quarter.

- GAAP gross profit margin increased to 43%, compared to 40%, primarily due to product mix and an increase in premises margin, partially offset by a decrease in identity reader margins.

- Base operating expenses, which include research and development, sales and marketing, and general and administrative costs were $12.9 million, compared to $10.3 million, up 25%. This is primarily the result of an increase in general and administrative (G&A) related expenditures due to a significant increase in legal and accounting professional fees associated with non-core business activities.

- Adjusted EBITDA for the quarter was $(4.2) million, compared to $(0.4) million, predominantly reflecting the decrease in revenues and the increase in legal and accounting professional fees.

- GAAP net loss from continuing operations was $(7.4) million in the second quarter of 2015, or $(0.67) per share, compared to a GAAP net loss from continuing operations of $(2.7) million, or $(0.34) per share. The second quarter of 2015 included restructuring costs of $0.02 million and impairment charges related to goodwill of $1.0 million, compared to restructuring costs of $0.6 million and no impairment charges in the second quarter of 2014.

32. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company had engaged in inappropriate revenue recognition practices; (2) that the Company's senior management encouraged a closed and ineffective control environment; (3) that, as a result, the Company's key accounting metrics were misstated; (4) that the Company lacked adequate internal controls at all relevant times; (5) and that, as a result of the foregoing, Defendants' statements about Identiv's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

C. **The Truth Emerges**

33. On November 30, 2015, the Company issued a press release announcing that it received notice from BDO, USA LLP ("BDO") that BDO had resigned, effective immediately, as the Company's independent registered public accounting firm.  The press release stated in relevant part:

On November 23, 2015, Identiv, Inc. (the "Company") received notice from BDO USA, LLP ("BDO") that BDO had resigned, effective immediately, as the Company's independent registered public accounting firm.

The reports of BDO and of Ernst & Young GmbH Wirtschaftspruefungsgesellschaft ("EY") on the Company's consolidated financial statements for the year ended December 31, 2014 and 2013, respectively, did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles except EY's report with respect to the fiscal year ended

December 31, 2013, which indicated that there was substantial doubt as to the Company's ability to continue as a going concern.

BDO has advised the Board of Directors (the "Board") of the Company that BDO is unwilling to be associated with the consolidated financial statements prepared by management for any of the fiscal periods within 2015 and will not complete its reviews of the interim financial information as of or for the periods ended March 31, 2015, June 30, 2015 or September 30, 2015, and additionally will not audit the Company's consolidated financial statements as of and for the year ending December 31, 2015 because of the disagreement described below in this Current Report on Form 8-K.

For the purposes of this Current Report on Form 8-K, the term "disagreement" is interpreted and used broadly, to include any difference of opinion concerning any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure which, if not resolved to the satisfaction of the independent registered public accountant, would have caused it to make reference to the subject matter of the disagreement in connection with its report.

During fiscal year 2015, the Board formed a Special Committee to investigate the allegations contained in a complaint. BDO advised the Board that BDO disagrees with the scope and the remediation of the special investigation that was undertaken by the Special Committee of the Board. The subject matter of the special investigation was first disclosed by the Company in a Form NTN 10-K filed with the Securities and Exchange Commission (the "SEC") on May 1, 2015 and a Current Report on Form 8-K filed with the SEC on May 4, 2015. The Board determined that the scope and the remediation of the special investigation were appropriate.

In addition, BDO has informed the Board of two material weaknesses in the Company's internal control over financial reporting. The first material weakness identified by BDO related to the Company's entity level controls, including a determination by BDO that "with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued."

The second material weakness identified by BDO related to revenue recognition; BDO determined that the Company has not designed and implemented appropriate controls to provide reasonable assurance that revenue transactions are adequately analyzed and reviewed to prevent or timely detect and correct misstatements. Specifically, during the course of conducting review procedures on the Company's interim financial information for the quarter ended June 30, 2015, BDO identified significant adjustments with respect to revenue transactions which resulted in the deferral of revenue; which errors were not identified by the Company's internal control over financial reporting. Those errors arose primarily as a result of the following matters:

- The Company did not appropriately consider the accounting for a revenue transaction totaling approximately $3.2 million, where the fact pattern suggested that the terms on the sales were not "fixed or determinable." This resulted in a

correcting adjustment of revenue of $3.2 million.

- In a different revenue transaction, there were undelivered elements in the arrangement that were not adequately considered and assessed by the Company, resulting in a correcting adjustment of $0.6 million.

The first of these transactions related to a significant long-standing reseller, with which the Company was in discussions regarding delivery and payment schedules. The $3.2 million shipment was made and accepted in June 2015, and the Company provided 90 day "extended payment terms" specified by the customer during the quarter ended June 30, 2015. The Company originally recorded revenue during the quarter ended June 30, 2015 whereas the fact pattern indicated that the terms were not "fixed or determinable" at the time and revenue should have been recorded when the amount became due and payable by the customer. The account was fully paid in September 2015, and the revenue recognized upon payment during the quarter ended September 30, 2015.

The second transaction related to an agreement that BDO was made aware of during the quarter. The Company considered revenue recognition with respect to this transaction and prepared a memorandum that was provided to BDO. While the customer accepted delivery of the non-recurring engineering work in June 2015, BDO advised, and the Company agreed, that the Company, in its memorandum, had failed to conclude that there were undelivered software elements in the arrangement for which vendor specific objective evidence of fair value had not been established and accordingly, the Company recorded an adjustment in June 2015 to defer this revenue. The Company will recognize such revenue in the current quarter now that it is actively selling the solution it developed.

The quarterly results included in the Company's Current Report on Form 8-K filed August 13, 2015 reflected the adjustments described above.

While the full Audit Committee of the Board and BDO have not discussed the subject matter of the disagreement with BDO, the Audit Committee through its Chairman has had discussions with BDO concerning the subject matter of the disagreement. The Company has authorized BDO to respond fully to the inquiries of the Company's successor accountant, Burr Pilger Mayer Inc., concerning the subject matter of this Current Report on Form 8-K (this "Report").

The Company has provided a copy of the disclosures in this Report to BDO and requested that BDO furnish the Company with a letter addressed to the SEC stating whether or not BDO agrees with the statements made by the Company set forth above. A copy of BDO's letter, dated November 30, 2015, is filed as Exhibit 16.1 to this Current Report on Form 8-K.

*(b)*

On November 25, 2015, the Audit Committee approved the appointment of Burr Pilger Mayer Inc. as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015, which appointment Burr Pilger Mayer Inc. accepted on November 25, 2015. During the Company's fiscal years ended December

31, 2014 and 2013 and in the subsequent interim period through November 25, 2015, neither the Company nor anyone acting on its behalf has consulted with Burr Pilger Mayer Inc. on any of the matters or events set forth in Item 304(a)(2) of Regulation S-K.

34.    As the result of this news, the share price of the Company's common stock plunged 15.59%, from a closing share price of $2.95 on November 30, 2015 to $2.49 per share on December 1, 2015 on *extremely* heavy trading volume.

## V.    LOSS CAUSATION

35.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Identiv's securities and operated as a fraud or deceit on Class Period purchasers of Identiv securities by materially misleading the investing public.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Identiv's securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Identiv's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VI.    FRAUD-ON-THE-MARKET DOCTRINE

36.    At all relevant times, the market for Identiv's securities was an efficient market for the following reasons, among others:

a)    Identiv securities met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

b)    Identiv filed periodic public reports with the SEC and NASDAQ; and

c)    Identiv regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

37.    As a result of the foregoing, the market for Identiv's securities promptly digested current information regarding Identiv from all publicly available sources and reflected such

information in the prices of the securities. Under these circumstances, all purchasers of Identiv securities during the Class Period suffered similar injury through their purchase of Identiv securities at artificially inflated prices and a presumption of reliance applies.

## VII.   NO SAFE HARBOR

38.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Identiv who knew that the statement was false when made.

## VIII.   CLASS ACTION ALLEGATIONS

39.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Identiv securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40.   The members of the Class are so numerous that joinder of all members is impracticable, since Identiv has millions of shares of stock outstanding and because the Company's shares were actively traded on NASDAQ.  According to Identiv's Form 10-K filed with the SEC on

March 23, 2015, as of March 6, 2015, Identiv had approximately 10.8 million shares issued and outstanding. While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

41. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class and Private Placement Class members include:

(a) whether the Exchange Act was violated by Defendants;

(b) whether Defendants omitted and/or misrepresented material facts in their publicly disseminated press releases and statements during the Class Period;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f) whether the price of Identiv securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of Identiv's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

42. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

43.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
#### Against IDENTIV for Violation of Section 10(b) of
#### the Exchange Act and SEC Rule 10b-5
#### (on behalf of the Class)

45.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

46.     This Count is asserted by Plaintiffs on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

47.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Identiv's common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Identiv's common stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

48.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Identiv's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

1    49.    As a result of their making and/or their substantial participation in the creation of

2    affirmative statements and reports to the investing public, Defendants had a duty to promptly

3    disseminate truthful information that would be material to investors in compliance with the

4    integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. §

5    229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect

6    to the Company's operations and performance so that the market prices of the Company's publicly

7    traded securities would be based on truthful, complete, and accurate information.  Defendants'

8    material misrepresentations and omissions as set forth herein violated that duty.

9    50.    Defendants engaged in the fraudulent activity described above knowingly and

10   intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs

11   and the Class.  Defendants knowingly or recklessly caused their reports and statements to contain

12   misstatements and omissions of material fact as alleged herein.

13   51.    As a result of Defendants' fraudulent activity, the market price of Identiv was

14   artificially inflated during the Class Period.

15   52.    In ignorance of the true financial condition of Identiv, Plaintiffs and other members

16   of the Class, relying on the integrity of the market and/or on the statements and reports of Identiv

17   containing the misleading information, purchased or otherwise acquired Identiv's common stock at

18   artificially inflated prices during the Class Period.

19   53.    Plaintiff and the Class's losses were proximately caused by Defendants' active and

20   primary participation in Identiv's scheme to defraud the investing public by, among other things,

21   failing to fully and accurately disclose to investors adverse material information regarding the

22   Company.  Plaintiff and other members of the Class purchased Identiv's stock in reliance on the

23   integrity of the market price of that common stock, and Defendants manipulated the price of

24   Identiv's common stock through their misconduct as described herein.  Plaintiff's and the Class's

25   losses were a direct and foreseeable consequence of Defendants' concealment of the true financial

26   condition of Identiv.

27

28

54.     Throughout the Class Period, Defendants were aware of material non-public information concerning Identiv's fraudulent conduct (including the false and misleading statements described herein).  Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

55.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Identiv common stock during the Class Period.

### COUNT II
**Against Individual Defendants for Violation of Section 20(a) of the Exchange Act**
**(on behalf of the Class)**

56.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

57.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Identiv, were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

58.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press

releases, and other public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

59.   The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Identiv's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Identiv's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

60.   Individual Defendants acted as controlling persons of Identiv within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with the Company, Individual Defendants had the power and authority to cause Identiv to engage in the wrongful conduct complained of herein.  Individual Defendants controlled Identiv and all of its employees. As alleged above, Identiv is a primary violator of section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of their conduct, Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

61.   As a direct and proximate result of the wrongful conduct of Identiv and Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**PRAYER**

**WHEREFORE**, Plaintiff demands judgment as follows:

1    (A)  Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of

2 Civil Procedure and certifying Plaintiff as a representative of the Class and his counsel as Class

3 counsel;

4    (B)  Awarding Plaintiff and the members of the Class damages, including interest;

5    (C)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

6 action, including and attorneys' fees; and

7    (D)  Awarding such equitable/injunctive or other relief as the Court may deem just and

8 proper

9            **JURY DEMAND**

10   Plaintiff demands a trial by jury.

11 DATED: December 7, 2015     PUNZALAN LAW, P.C.

12            By: /s/ *Mark Punzalan*

13              Mark Punzalan

14            600 Allerton Street, Suite 201
Redwood City, California 94063

15            Tel: 650.362.4150
Fax: 650.362.4151

16            Na'il Benjamin (SBN: 240354)

17            nbenjamin@BenjaminLawGroup.com
BENJAMIN LAW GROUP, A.P.C.

18            101 California St., Ste. 2710
San Francisco, California 94111

19            Tel: 415.633.8833
Fax: 415.349-3334

20            Counsel for Plaintiff

21

22

23

24

25

26

27

28

## PLAINTIFF CERTIFICATION

I, Ana Ruggiero, hereby declare that:

1.      I have reviewed a draft Complaint in this class action and have authorized the filing thereof.

2.      I did not purchase (or otherwise acquire) or sell securities of Identiv, Inc., the subject of the Complaint, at the direction of counsel or in the hope to participate in any private action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

3.      I am willing to serve as a representative plaintiff on behalf of the class defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.      I have engaged in the following transactions involving the securities of Identiv, Inc.:

| Acquisitions | Date | Price Per Security | Total |
|---|---|---|---|
| 1,394 | 3/23/2015 | 5.91 | 8,238.34 |

| Sales | Date | Price Per Security | Total |
|---|---|---|---|
| | | | |

5.      During the last three years preceding the date of this Certification, I have sought to serve as a representative plaintiff on behalf of a class in the following actions brought under the Securities Act of 1933 or the Securities Exchange Act of 1934:

NONE

6.      I will not accept any payment for serving as a representative plaintiff on behalf of the class beyond its pro rata share of any recovery, except as ordered by the Court.

7.      Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 7, 2015.



Ana Ruggiero